ELIHU E. JACKSON, Governor, WILLIAM PINKNEY WHYTE, Attorney-General, and others *vs.* JOHN CARROLL WALSH, and others.

*Corporations—Amendment and Repeal of Charters by the Legislature—Sec. 47 of Art. 3 of the Constitution of 1851, Sec. 51 of Art. 3 of the Constitution of 1864, and Sec. 48 of Art. 3 of the Constitution of 1867, Relating to such Alteration and Repeal—Vested rights—Legislative powers—Maryland Agricultural College.*

By section 47 of Article 3 of the Constitution of 1851, it was provided that "corporations may be formed under general laws, but shall not be created by special Act, except for municipal purposes, and in cases where, in the judgment of the Legislature, the object of the corporation cannot be attained under general laws. All laws and special Acts pursuant to this section may be altered from time to time, or repealed  *  *  *  *" HELD :

1st. That this provision was designed to be, and as far as language could make it so, was a clear and explicit limitation upon the power of the General Assembly to pass thereafter any Act of incorporation not subject to repeal or amendment by legislative authority.

2nd. That upon the adoption of that Constitution every charter thereafter granted, even though it contained no reservation of the right to repeal or alter it, was subject to this paramount provision of the organic law.

3rd. That the right of the State to repeal or alter an Act of incorporation was the express condition upon which the grant was

Jackson, Governor, *et al. vs.* Walsh, *et al.*

made in every instance after the adoption of said Constitution, and an acceptance of the grant was an unequivocal, as it was an irrevocable, acceptance of that condition.

4th. That this right would be no more effective if it were written in the charter in the very words of the Constitution itself; and its exercise by the Legislature cannot, when it invades no vested right of property, be successfully resisted in the Courts as an infringement of a contract, because the constitutional provision is a term or stipulation embodied in the contract to which the State and the incorporators are equally parties.

The "Maryland Agricultural College," was incorporated by the Act of 1856, ch. 97, under which commissioners were appointed to receive, and did receive, subscriptions to the capital stock, and the method of electing trustees was prescribed and their number designated. The College having become involved in debt the Act of 1866, ch. 53, was passed, appropriating a large sum of money to be used in liquidating the indebtedness, and in the purchasing of furniture and apparatus, provided the College would, by a good and valid title, make the State of Maryland "equal joint owner of the property" then owned by the College. The fourth section of this Act reduced the number of trustees to eleven, "four of whom shall be members of the State Board of Education, to represent the State's interest as joint owner, and the other seven shall be elected by a majority of the private stockholders in the manner now provided by law." The Act was accepted by the stockholders of the College; the sum appropriated for its relief was paid by the State, and a conveyance was made to the State, whereby it became an "equal joint owner of the property." By the Act of 1880, ch. 231, the number of the trustees was changed, being increased to twelve, five of whom were to be elected by the stockholders, and the others, a majority of the whole number, were to be, the Governor and other State officers and the U. S. Commissioner of Agriculture. This Act was not formally accepted by the private stockholders, but was acted on by them uninterruptedly until 1888. By the Act of 1888, ch. 326, another change was made in the number of trustees, repealing in this particular both the Act of 1866, ch. 53, and the Act of 1880, ch. 231. By the Act of 1888, ch. 326, the number of trustees was increased from twelve to eighteen, five of whom were to be elected by the stockholders, and the remaining thirteen were to consist of the Governor and other State officers, together with the U. S. Commissioner of Agriculture,

Jackson, Governor, *et al. vs.* Walsh, *et al.*

and one person from each congressional district of the State, to be appointed by the Governor. Under this Act the stockholders elected in 1888, 1889, and 1890, five of the eighteen trustees. But at the annual meeting in 1891 they claimed the right to elect under the fourth section of the Act of 1866, ch. 53, seven trustees, and directed that proceedings be instituted with a view of determining "who are the trustees duly appointed by law to administer the affairs of the College." Upon a petition filed by the seven trustees then elected by the stockholders against the trustees representing the State, the Acts of 1880 and 1888 were held to be unconstitutional and a *mandamus* was ordered to issue requiring the State's representatives to allow the petitioners, as stockholders' trustees, a representation and vote of seven trustees in a board of eleven members according to the provisions of the Act of 1866, ch. 53. Upon an appeal from this order it was HELD:

1st. That the case presented no question of vested rights.

2nd. That the Act of 1880, ch. 231, in giving the State, which was an equal joint owner of the College, a more liberal representation in the board of trustees, interfered with no contractual, vested, or constitutional rights, of the private stockholders, and violated no obligation whatever.

3rd. That it was a measure which concerned the government of the College and the disbursement of the funds intrusted to it by the State, a measure which the State had, under section 48 of Article 3, of the Constitution of 1867, the authority to adopt.

4th. That the authority to adopt it being within the limits of the Legislature's constitutional prerogatives, questions of expediency as to its exercise were not for Courts of justice to consider or discuss.

5th. That there was nothing in the Act of 1866, ch. 53, which could deprive the General Assembly of the power to pass either the Act of 1880, ch. 231, or the subsequent Act of 1888, ch. 326.

6th. That while such of the provisions of the Act of 1866 as related to a sale to the State of a one-half interest in the property, when accepted, formed a contract which neither party could, without the consent of the other, disregard, its other provisions relative to the number of trustees and the mode of electing them were matters affecting merely the government of the affairs of the corporation, and were within the control of the General Assembly, and subject to modification by it under the Constitutions of 1864 and 1867.

Jackson, Governor, *et al. vs.* Walsh, *et al.*

7th. That the Act of 1866, which declared in terms that it was amendatory of the original charter, was intended to be and did become a part of that charter, and under the Constitutions of 1864 and 1867 was as subject to amendment, except in the particular above alluded to, as the original charter itself.

8th. That if said Act had expressly said that it was irrevocable, and not subject to amendment or repeal, such a clause would have been nugatory and void. The Legislature was then, and still is, powerless to create or amend any charter, except the charters of Banks, in such a form as to be beyond the reach or control of subsequent repeal or modification.

9th. That the right to amend, if not included in the right to repeal expressly reserved in the original charter, was vested in the Legislature by the Constitutions of 1851, 1864 and 1867.

10th. That assuming the Acts of 1880 and 1888 to have been passed without constitutional authority, they were acted on and acquiesced in by the stockholders of the College with full knowledge of their provisions, and thereby were legally accepted.

An Act of Assembly, amending an irrepealable charter, is void only when it attempts to vary the contract without the consent of the other party thereto. But like any other contract, an irrepealable charter may be altered by the agreement of both the parties to it. Hence a legislative enactment that would, without acceptance be invalid, becomes, when accepted by the corporation, perfectly valid and binding, the Act and the acceptance constituting a new contract.

This is true in all cases where the only ground of objection to the statute is that it seeks to amend without previous assent an irrepealable charter.

An Act of Assembly which is absolutely and unconditionally void cannot be made valid by consent.

APPEAL from the Circuit Court for Prince George's County.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., MILLER, ROBINSON, IRVING, BRYAN, FOWLER, and McSHERRY, J.

*William Pinkney Whyte*, and *John Prentiss Poe, Attorney-General,* for the appellants.

*Charles H. Stanley,* (with whom was *Charles J. M. Gwinn,* on the brief,) for the appellees.

McSHERRY, J., delivered the opinion of the Court.

The *Act of* 1856, *chapter* 97, incorporated the "Maryland Agricultural College." By the provisions of that statute commissioners were appointed and empowered to receive, and they did receive, subscriptions to the capital stock of the body corporate. The Act further prescribed the method of electing twenty-two trustees to manage the affairs of the college, and by the eighth section, upon the conditions therein set forth, but not necessary to be stated here, appropriated, out of the State Treasury, the sum of six thousand dollars as an annual endowment of the college. The eleventh section enacted, "that the General Assembly of Maryland hereby expressly reserves the right, at any future session, to withdraw any part or all of said endowment of six thousand dollars, hereinbefore appropriated, *or to repeal, vacate, and make void* all and every part of the incorporation aforesaid, and all rights, privileges, and immunities hereinbefore mentioned, and the endowment and donation of the six thousand dollars to be paid out of the treasury as hereinbefore provided for, shall cease to be paid." By the *Act of* 1858, *ch.* 265, the number of trustees was increased to twenty-five, and by subsequent legislation in 1865, *chapter* 178, the Comptroller of the State was directed to make additional payments to the college, and the State Board of Education was declared to be *ex officio* members of the board of trustees. Notwithstanding the State's·liberal aid, the college seems to have become heavily involved in debt, and in 1866 the Legislature by *chapter* 53 of the Acts of that session,

appropriated forty-five thousand dollars to be used in liquidation of this indebtedness, and in the purchase of furniture and apparatus, provided the college would by a good and valid title make the State of Maryland "equal joint owner of the property" of every kind and description then owned by the college. The fourth section of this Act reduced the number of trustees to eleven, "four of whom shall be members of the State Board of Education, to represent the State's interest as joint owner, and the other seven shall be elected by a majority of the private stockholders, in the manner now provided by law." This Act of 1866 was duly accepted by the stockholders of the college; the forty-five thousand dollars were paid by the State, and a conveyance was made to the State, whereby the latter became an "equal joint owner of the property." In 1880 by *chapter* 231, the General Assembly again changed the number of trustees, increasing them to twelve, five of whom were to be elected by the private stockholders; and the Governor, Comptroller, Treasurer, President of the Senate, Speaker of the House of Delegates, Attorney-General, and the United States Commissioner of Agriculture were to be the other seven. This Act, whilst never formally accepted by a vote of the private stockholders, was acted on by them uninterruptedly until 1888. During the period which intervened between the passage of the Act of 1880 and the year 1888, the stockholders elected only five of the twelve trustees provided for by the Act of 1880. The *Act of* 1888, *chapter* 326, made another change in the number of trustees, repealing in this particular both the *Act of* 1866, *chapter* 53, and the *Act of* 1880, *chapter* 231. By the Act of 1888 the number of trustees was increased from twelve to eighteen, of whom five, the number fixed by the Act of 1880, were to be elected by the stockholders, and the remaining thirteen were to consist of the Governor, Comptroller,

Treasurer, President of the Senate, Speaker of the House of Delegates, Attorney-General, the United States Commissioner of Agriculture, and one person from each of the congressional districts of the State, to be appointed by the Governor. Under this Act the stockholders elected in 1888, 1889 and 1890 five of the eighteen trustees; but at the annual meeting of 1891 they claimed the right to elect under the fourth section of the Act of 1866, chapter 53, seven trustees, and directed that proceedings be instituted with a view of determining "who are the trustees duly appointed by law to administer the affairs of the college." Pursuant to this action a petition was filed in the Circuit Court for Prince George's County by the seven gentlemen who claim to have been elected trustees by the stockholders at the meeting in April, 1891, against the trustees representing the State, and a *mandamus* was prayed for, to compel the State's representatives to turn over to the petitioners the office of trustees of said college, and the books and papers relating thereto, and to require the State's representatives to allow. to the petitioners, as stockholder trustees, the representation and vote of seven trustees in a board of eleven members, according to the provisions of the *Act of* 1866, *chapter* 53.

The Circuit Court decided that the *Acts of* 1880, *chapter* 231, and 1888, *chapter* 326, were unconstitutional and void and ordered a *mandamus* to issue as prayed. From that order this appeal was taken.

The grounds upon which the alleged invalidity of this legislation is rested by the Circuit Court are—*first*, that the *Act of* 1866, *chapter* 53, was a contract between the State and the stockholders of the college, which could not be impaired by subsequent enactments; and *secondly*, that whilst the original charter of the college—the *Act of* 1856, *chapter* 97—contained a provision reserving to the State the right to *repeal* and totally abrogate the char-

ter, the right to *amend* it was not within the terms of the reservation.

When the charter was granted by the Legislature the Constitution of 1851 was in force. By *section* 47 *of Article* 3 of that Constitution it was provided that " corporations may be formed under general laws, but shall not be created by special Act, except for municipal purposes, and in cases where, in the judgment of the Legislature, the object .of the corporation cannot be attained under general laws. *All laws and special Acts pursuant to this section may be altered from time to time, or repealed.* * * * " This provision was designed to be, and as far as language could make it so was, a clear and explicit limitation upon the power of the General Assembly to pass thereafter any Act of incorporation not subject to repeal or amendment by legislative authority. Upon the adoption of that Constitution, every charter thereafter granted, even though it contained no reservation of the right to repeal or alter it, was subject to the paramount provision of the organic law, which was binding on the Legislature and the corporation alike. The right of the State to repeal or alter an Act of incorporation was the express condition upon which the grant was made in every instance after the adoption of the Constitution of 1851, and an acceptance of the grant was an unequivocal, as it was an irrevocable, acceptance of that condition. This right could have been no more effective had it been written in the charter in the very words of the Constitution itself; and its exercise by the Legislature can not, when it invades no vested right of property, be successfully resisted in the Courts as an infringement of a contract, because the constitutional provision is a term or stipulation embodied in the contract to which the State and the incorporators are equally parties. But it is needless to pursue the subject further, for it has been distinctly, and we had supposed finally, settled by this

Court in *State vs. Northern Central Railway Co.*, 44 *Md.*, 164; *American Coal Co. vs. Consolidation Coal Co.*, 46 *Md.*, 22· *Sprigg vs. Western Telegraph Co., et al.*, 46 *Md.*, 77; *Appeal Tax Court of Balto. City vs. Northern Central Railway Co.*, 50 *Md.*, 419, and by the Supreme Court of the United States in *Shields vs. Ohio*, 95 *U. S.*, 324; *Sinking Fund Cases*, 99 *U. S.*, 720.

There is nothing in the cases of *Norris vs. Trustees of the Abingdon Academy*, 7 *G. & J.*, 7; *Regents of the University of Maryland vs. Williams*, 9 *G. & J.*, 365, and *Pennsylvania Railroad Co. vs. Balto. & Ohio Railroad Co.*, 60 *Md.*, 263, relied on by the appellees, at all in conflict or at variance with these fundamental principles, for those cases all involved questions arising under charters which contained no reservation of the right to repeal or amend, and which had been granted prior to the adoption of the Constitution of 1851. Under such conditions, the charter being a contract between the State and the incorporators, the State was powerless, without the consent of the corporation, to change, by any enactment whatever, the terms of a perfected contract. It was the absence of such a provision from the organic law as the Constitution of 1851 contained, or the absence of a reservation of like import from the charters themselves, which marks the broad and palpable difference between those cases and the one at bar. It is certainly true that " beyond the sphere of the reserved powers, the vested rights of property in corporations in such cases are surrounded by the same sanctions and are as inviolable as in other cases," *Sinking Fund Cases*, 99 *U. S.*, 721; but the case before us involves no question of vested rights at all.

The State, as we have seen, is, and since 1866 has been, an equal joint owner of the Maryland Agricultural College. It is, consequently, interested in its management. It has donated to the College large sums of

money received by the State from the general government under Acts of Congress, which made appropriations to the several States for the establishment of agricultural experiment stations, and was, for that additional reason, concerned in the administration of the affairs of the body corporate.    To give to the State a more liberal representation in the Board of Trustees, the *Act of* 1880, *chapter* 231, was adopted, and by its provisions a majority of the trustees were made to consist of important State officers.    But this interfered with no contractual, vested, or constitutional rights of the private stockholders.    It deprived them of no property.    It violated no obligation whatever.    It was a measure which concerned the government of the College and the disbursement of the funds entrusted to it by the State, a measure which the State had, under the 48th section of Article 3 of the Constitution of 1867, the undoubted authority to adopt. The authority to adopt it being clearly within the limits of the Legislature's constitutional prerogatives, questions of expediency as to its exercise are not for Courts of justice to consider or discuss.

Nor is there anything in the *Act of* 1866, *chapter* 53, which could possibly deprive the General Assembly of the power to pass either the *Act of* 1880, *chapter* 231, or the subsequent *Act of* 1888, *chapter* 326.    The Act of 1866 was, it is true, accepted by the stockholders of the College, and whilst such of its provisions as related to a sale to the State of a one-half interest in the property, when accepted, undoubtedly formed a contract which neither party could, without the consent of the other, disregard, its other provisions relative to the number of trustees and the mode of electing them, were matters affecting merely the government of the affairs of the corporation, and were clearly within the control of the General Assembly, and subject to modification by it under the Constitutions of 1864 and 1867.

The Act of 1866, declared in terms that it was amendatory of the original charter. It was intended to be and did become a part of that charter, and under the Constitutions of 1864 and 1867, was as subject to amendment, except in the particular just alluded to, as the original charter itself. If the Act of 1866 had expressly said that it was irrevocable, and not subject to amendment or repeal, such a clause would have been utterly nugatory and void. The Legislature was then, and still is, powerless to create or amend any charter, except the charters of Banks, in such a form as to be beyond the reach or control of subsequent repeal or modification. The right to amend, if not included in the right to repeal expressly reserved in the original charter, was vested in the Legislature by the Constitutions of 1851, 1864 and 1867.

The case of *New Jersey vs. Yard*, 95 *U. S.*, 104, so much relied on by the appellees, has no application to the case at bar. The Constitution of New Jersey contained no such provision as we have cited from our own, though there was a statute which declared that every Act of incorporation should be subject to amendment and repeal. The Supreme Court held that where a charter had been granted containing a clause reserving the right to amend, and subsequently an amendment was passed and accepted containing no such reservation, the amendment could not thereafter be altered without the consent of the corporation. The reason assigned was that, as the restriction upon the Legislature was only an Act of Assembly, the Legislature might disregard that restriction, and by disregarding it repeal it to that extent; and that the failure to incorporate the reservation in the amendatory Act was a repeal of the reservation in that instance. But the Court was careful to distinguish that case from those which might arise and had arisen in States where the organic law contained, as in Maryland, the reservation and restriction we have cited.

We have not the slightest difficulty in reaching the conclusion that the *Acts of* 1880, *chapter* 231, and 1888, *chapter* 326, are entirely valid and constitutional.

But there is still another view of the case that is, in our opinion, equally conclusive against the right of the petitioners to have the relief they seek; and it is this: Assuming the Acts of 1880 and 1888 to have been passed without constitutional authority, they were acted on and acquiesced in by the stockholders of the college with full knowledge of their provisions, and thereby were legally accepted. Acceptance of a charter need not be proved by a vote of the stockholders; it may be inferred from an exercise of the powers granted. *New Central Coal Co., et al. vs. George's Creek Coal and Iron Co.,* 37 *Md.,* 537; *Hammond vs. Straus,* 53 *Md.,* 1. This is equally true of an amendment to a charter. Now, as we have said, by the Act of 1880, the number of trustees was reduced from *twenty-two* to *twelve,* six of the twelve being officers of the State, one, the United States Commissioner of Agriculture, and five constituting the representation of the private stockholders. The number of trustees these stockholders were authorized to elect was distinctly restricted to five instead of seven allowed by the Act of 1866. For seven years consecutively the stockholders forebore to elect seven, and only elected five. There was no Act of Assembly in force empowering them to elect less than seven save the Act of 1880. In annually electing but five trustees they of necessity acted on and acquiesced in its provisions. They adopted those provisions as unmistakably as if they had passed a formal resolution to that effect. The Act of 1888, still restricting the number of trustees on the part of the stockholders to five, was also acted on, in the same manner, for three years. After this affirmative recognition of and deliberate acquiescence in the terms of these statutes, it is too late for the stockholders to say in a

Court of law that they have not assented to or accepted this modification of the Act of 1866. But it has been insisted that no assent or acceptance can make an unconstitutional Act, constitutional; and, assuming the Acts of 1880 and 1888, to be unconstitutional, they could not be made valid by being accepted by the stockholders. This argument begs the question. An Act of Assembly, amending an irrepealable charter, is void only when it attempts to vary the contract without the consent of the other party thereto. But, like any other contract, an irrepealable charter may be altered by the agreement of both the parties to it. Hence a legislative enactment that would without acceptance be invalid, becomes, when accepted by the corporation, perfectly valid and binding—the Act and the acceptance constituting a new contract. The acceptance gives effect to that which would otherwise be inoperative. This is true in all cases where the only ground of objection to the statute is that it seeks to amend without previous assent an irrepealable charter. Standing alone, such an Act would be nugatory, but coupled with an acceptance, actual or implied, it would be valid. An Act of Assembly which is absolutely and unconditionally void cannot be made valid by consent. If the Legislature has transcended the limits of its defined power, acquiescence will not aid its invalid enactment. But an amendment of an irrepealable charter is not absolutely void—it is only conditionally so, It is void provided it be not accepted or acquiesced in. In the very case relied on by the appellees, *The Regents of the University of Maryland vs. Williams.* 9 *G. & J.*, 416, this principle is distinctly recognized. Chief Judge BUCHANAN, speaking for the Court said: "It is not intended by what has been said, to deny that an Act for altering a charter, to the passing of which, previous assent has not been given, can be constitutional, unless it contains an express offer for

acceptance, or is made by its terms to depend upon a subsequent assent. The passing of it with nothing more, amounts to an offer only for acceptance, and if afterwards accepted, either expressly *or by acting under it,* it then receives life and becomes an operative law."

It follows from the views we have expressed that the order appealed from must be reversed, and the petition for a *mandamus* must be dismissed.

*Order reversed, and*
*petition dismissed, with*
*costs in both Courts.*

(Decided 4th February, 1892.)