[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION CT Page 12732
"Courts do not unmake bargains unwisely made." So said our Supreme Court in Osborne v. Locke Steel ChainCo., 153 Conn. 527, 533 (1966), providing an apt subtitle for this case.
Plaintiff Yellow Page Consultants, Inc., brings this action to collect amounts it claims are due from defendant World Gym of Newington under a contract between the parties. The case was tried to the court, and both parties presented testimony and other evidence. The court finds in favor of the plaintiff.
Based on the evidence presented at trial, the court finds the following facts. The plaintiff is a Connecticut corporation engaged in the business of advising other businesses on the effective use of advertising in the yellow pages of telephone books. The defendant is a Connecticut corporation operating a commercial health and exercise club in Newington. At all relevant times, the defendant has placed and maintained advertisements in the yellow pages of the Hartford and New Britain telephone books published by Southern New England Telephone Company.
In 1993, prior to any dealings with the plaintiff, the defendant had a 3/8ths page display advertisement in the Hartford yellow pages and a 1/4th page display ad in the New Britain yellow pages. The annual fees for these advertisements, charged by SNET, were $8100 (Hartford) and $2736 (New Britain).
In July 1993, a representative of the plaintiff, Luc Deslauriers, contacted the defendant's president, Anthony Riccio, and set up an appointment, hoping to sell the services of the plaintiff to the defendant. The two men met for the first time on July 13, 1993. On that date, CT Page 12733 they signed a contract in behalf of their respective companies.
The contract between the parties provides that the plaintiff "will review and analyze the (defendant's) Yellow Page program and . . . disclose information on how to reduce the (defendant's) directory advertising expenses."
As fees for the above services, the contract provides that the defendant will pay the plaintiff an amount equal to "50% of any yearly savings for a period of three (3) years. The savings each year will be based on the (defendant's) existing Yellow Page program in year one and calculated at the current year's renewal rate." In the context of this case, the defendant's "existing Yellow Page program in year one" means the total fees charged by SNET for defendant's advertisements in the 1993 Hartford and New Britain yellow pages, $10,836. If the defendant, acting on the advice of the plaintiff, made any changes in its Hartford and/or New Britain yellow page advertising for the 1994 telephone books, which resulted in lower fees charged by SNET, the contract obligates the defendant to pay the plaintiff one-half the difference between the 1993 fee and the 1994 fee; that is, one-half the savings realized by the defendant as the result of the plaintiff's advice.
The contract provides that the same calculation is repeated at the beginning of each of the next two advertising years, in this case 1995 and 1996, using the new SNET rates in effect for those years, as applied to the advertisements actually run by the defendant during those years. The contract further provides, however, that "[i]f the (defendant) does not make any changes that result in savings, no fees are due to (the plaintiff)." In the context of the present case, this clause means that the defendant would not be liable under the contract for the 1995 and 1996 advertising years if the defendant did not continue to use the yellow page advertisements that were based on the plaintiff's advice.
When Deslauriers and Riccio met on July 13, 1993, Deslauriers explained how the contract provisions would apply in general to the defendant's advertising program, CT Page 12734 as summarized above. He obtained some information from Riccio concerning the plaintiff's business. He did not, however, do any extensive research into the defendant's marketing techniques or customer base. At that first meeting, Deslauriers did not give any advice regarding changes to the plaintiff's existing advertising program. Riccio signed the contract on that date, however, and the court finds that he did so after reading it and fully understanding its terms. There was no evidence presented that might indicate any inequality in bargaining power between the two companies nor any evidence indicating fraud or other impropriety in the formation of the contract. The court finds that no such irregularities were present. See Emlee Equipment Leasing Corporation v.Waterbury Transmission, Inc., 31 Conn. App. 455, 465.
On July 19, 1993, Deslauriers returned to the plaintiff's office and again conferred with Riccio. This time, Deslauriers provided specific advice, urging changes in the defendant's advertising program. Specifically, he advised the defendant to reduce the size of the advertisements so that they would fit in the alphabetical columns under the heading for the "Health Clubs" category. He told Riccio that this would guarantee placement of the ad in that category, where potential customers would look first. He pointed out that the publisher does not guarantee such placement for the larger display advertisements. He advised Riccio that a potential customer of a health club is less influenced by the size of the advertisement than by the geographical location of the club. Since that information is always "researchable" in the advertisement regardless of its size, Deslauriers advised Riccio that the smaller size ads would be as effective as the larger display ads and would, of course, cost much less. The text of the new ads was written by Riccio and Deslauriers together. The plaintiff's draftsman laid out the format.
In addition to the work on the yellow pages ads; Deslauriers advised the defendant how it could obtain free white pages listings, resulting in some small additional savings.
Deslauriers has a college degree in liberal arts. Prior to his association with the plaintiff corporation, CT Page 12735 he had worked in wholesale and retail sales jobs, but he had had no experience in yellow page advertising. He commenced work with the plaintiff in May 1993. He was given a six week training course concentrating on yellow pages advertising. The plaintiff's president, David Ford, conducted the training course. Ford had had extensive experience in that field, having previously worked for SNET.
The defendant accepted Deslauriers's advice. Following the meeting on July 19, 1993, the defendant ordered new advertisements for the year beginning in April 1994. These were the advertisements prepared in accordance with Deslauriers's recommendations. Because they were much smaller, these advertisements were substantially cheaper than those used in the prior year. The cost for the year for the Hartford yellow pages was $1044; for the New Britain ads it was $540. Based on the method of calculation summarized above, the plaintiff billed the defendant the amount of $4903.56, representing one-half the difference between the amount the defendant had paid for its 1993 yellow page advertising and the amount it would pay for the reduced 1994 advertising.
The defendant initially balked at paying the full amount due for the 1994 advertising, but then accepted a plan of payments in installments. Ultimately, with a final payment made in April 1994, the defendant paid the full amount charged by the plaintiff for the first year covered by their contract — the April 1994 yellow pages advertising year.
In 1994 and again in 1995, at the times when renewal of the defendant's yellow page advertising was due, the plaintiff contacted the defendant and offered further assistance on the defendant's yellow page advertising program. The plaintiff also billed the defendant for amounts calculated according to the contract. These were based on the assumption that the defendant was continuing to run the same ads that had been recommended by the plaintiff in 1993 for the first year. In fact, the defendant did run the same ads for those two contract years. The amounts billed for the 1995 and 1996 advertising years were $5,043.48 and $5192.94, respectively, including sales tax. The defendant does not CT Page 12736 dispute the calculations.
The defendant refused to pay the amounts billed for years two and three of the contract. The contract provides a late fee of 1.5% per month. As of the date of the trial, the total amount due under the terms of the contract for the second and third years including late fees, is $14,878.80. The contract also provides that the defendant shall pay "all reasonable costs of collection including legal fees." The plaintiff claims $11,187.50 in legal fees plus $446.57 disbursements, based on an affidavit of its attorneys.
The defendant, in its answer to the plaintiff's revised complaint, admits that the parties entered into the contract in question. As noted above, the court finds that the plaintiff performed services contemplated by that contract; that is, it provided advice on how to reduce advertising costs. The court finds that the plaintiff tendered further performance under the contract, in 1994 and 1995, when it offered to provide additional assistance, but the defendant refused such further performance. During those years, however, the defendant did continue to utilize the advice that the plaintiff originally provided. The court finds that the defendant has paid part of the consideration specified in the contract but has refused to pay the full amount due under the terms of the contract.
"Where one furnishes services under a contract at the request of another and with the expectation that he will be paid for his services he is entitled to payment in accordance with the terms of the contract." FirstHartford Realty Corporation v. Ellis, 181 Conn. 25
(1980).
The defendant seeks to avoid that elementary rule of common sense and business law by claiming, in its first special defense, that "[t]he service allegedly provided by the Plaintiff was of no value to the Defendant."[1]
The defendant argues that the only substantive advice that the plaintiff provided was that the defendant should "shrink" the size of its advertisements and thereby realize cost savings. The defendant contends that that CT Page 12737 idea is nothing more than common knowledge, so obvious as to be worthless as advice. In support of this argument, Riccio, the defendant's president, testified that he already knew, without the plaintiff's advice, that smaller ads would cost less.
The defendant argues further that the contract requires the plaintiff to provide consulting services and that Deslauriers lacked the expertise to be a consultant.
The defendant cites Masline v. New York, New Haven Hartford Railroad Co., 95 Conn. 702 (1921), in support of its special defense. In that case, the defendant railroad company agreed to pay the plaintiff for advice on how to increase the defendant railroad company's revenue. The advice turned out to be: "Sell advertising space." The court refused to enforce the contract even though the defendant took the advice and profited from it. The court took judicial notice of the fact that the advice was "information . . . long known to everybody and suggestive of nothing new." The court concluded that what was "offered as consideration for the agreement turns out to be no consideration, and the agreement falls." Id., 710.
Although the Masline decision is appealing in its apparent simplicity and at first glance seems to be common sense, this court concludes that its doctrine should be applied sparingly, if at all, and not in this case.
In Masline, the court found that the plaintiff "offered no physical plan or device of his own for carrying the idea into effect . . . To furnish a consideration for a contract of this kind the plaintiff must . . . if the idea is common . . . present a specific method of his own for the use and application by the defendant of the common idea." Id., 711.
In the present case, the principal element of the plaintiff's advice to the defendant was to reduce the size of the ads. And most people, apparently including the defendant's president Riccio, would expect that such a change would also reduce the cost. But the plaintiff offered more than the bare advice to cut the size; the CT Page 12738 advice included suggestions on how to make the smaller ads as effective as the larger display ads, it included assistance with the text of the new ads, and it included the layout of the new ads. So, although the main thrust of the advice was to save money by reducing the size of the ads, an idea perhaps as obvious as that sold to the railroad in Masline, the plaintiff in this case did "present a specific method of his own for the use and application" of the idea. That alone is sufficient to exempt this case from the Masline doctrine.
An even more significant difference between this case and Masline is that the defendant in this case demonstrably did not consider the advice worthless. In fact, the defendant was willing to pay and did pay more than $4000 for it. The defendant in this case is not, therefore, despite the language of its first special defense, really claiming that there was a failure of consideration but only that the full consideration was too much. Such a claim is not a bar to enforcement of a contract that is otherwise legal.
"Whether the obligation is or is not a reasonable one under present conditions, or whether it was or was not at its inception a reasonable one, is a matter of no consequence . . . Parties who fairly and voluntarily assume hard bargains cannot claim relief from them for that cause." Southington v. Southington Water Co.,80 Conn. 646, 655 (1908). In its more modern incarnation, the rule is expressed as "in the absence of fraud or other unconscionable circumstances, a contract will not be rendered unenforceable at the behest of one of the contracting parties merely because of an inadequacy of consideration." Osborne v. Locke Steel Chain Co., supra,153 Conn. 533.
Certainly, many business people would view this contract on its face as unfavorable to the defendant. Many would also question Deslauriers' qualifications and the value of the advice he gave the defendant. And certainly, the contract by its terms required the defendant to pay the plaintiff a potentially large sum of money without obligating the plaintiff specifically to provide a commensurate service. But the law does not intervene in transactions, conducted by two commercial CT Page 12739 enterprises at arms' length, to rescue one who acted with little prudence or foresight. The court concludes that the contract in this case, however improvidently entered into by the defendant, is nevertheless legal and binding on the defendant in its entirety. Specifically, the plaintiff is entitled to be paid the amounts calculated to be due in accordance with the plain terms of the contract. This includes amounts due for years two and three of the contract, applicable late fees and reasonable attorneys fees and costs.
As noted, the plaintiff has presented an affidavit from its attorneys showing fees charged for prosecuting this action in the amount of $11,187.50, based on 44.75 hours of work at the rate of $250 per hour.
The plaintiff is entitled to recover only such fees as are "reasonable costs of collection" in accordance with the contract. In determining what are reasonable fees, the court takes into consideration the amount of time spent by the attorney on the case, the complexity of the issues involved, and the results achieved.
The court has no reason to question the amount of time that the plaintiff's attorney asserts was spent on this case in attempting to collect on the contract and in preparing for trial. The court takes notice, furthermore, that the attorney spent several more hours at trial and in preparing a post-trial brief at the invitation of the court. With respect to the complexity of the issues, however, the court notes that the testimony and evidence presented by the parties was relatively brief and that the plaintiff's claims and the defendant's special defense were relatively straightforward. In particular, there were no complicated statutes or case law involved in the position of either party. With respect to the success achieved, this was a contract claim, and the plaintiff was limited in its recovery by the terms of the instrument, but it did achieve all that it was allowed.
The defendant presented no evidence to dispute the plaintiff's claim for attorneys fees, but it did point out by way of argument that General Statutes § 42-150aa
limits recovery of fees in consumer contract cases to 15%. This statute plainly does not apply to transactions CT Page 12740 between two business corporations, as in this case. Accordingly, the court assigns it little weight.
Taking into account the factors summarized above, the court concludes that in this case a reasonable fee to be awarded the plaintiff's attorney is $5275.00. That compensates the attorney for time spent as indicated in his affidavit, plus 8 hours of trial time and post-trial work, a total of 52.75 hours, all at the rate of $100 per hour. That hourly rate, which is less than that requested by the plaintiff's attorney, is based on the relative lack of complexity of the issues involved in this case and the nature of the legal work performed.
To summarize, the plaintiff is entitled to recover the sum of $14,878.80 as the amount due under the contract including late fees, plus $5275.00 as reasonable attorney fees, plus $446.57 disbursements for a total of $20,600.37. Judgment may be entered for the plaintiff accordingly.
MALONEY, J