IRIS R. JACQUES ET AL. *v.* H. O. PENN MACHINERY COMPANY, INC., ET AL.

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, JS.

Argued February 7—decision released May 14, 1974

*Marshall S. Feingold,* with whom, on the brief, was *Edward D. O'Brien, Jr.,* for the appellants (named defendant et al.).

*Edward D. O'Brien,* assistant attorney general, with whom were *William J. Friedeberg,* assistant attorney general, and, on the brief, *Robert K. Killian,* attorney general, for the appellant (defendant the Second Injury and Compensation Assurance Fund).

No appearance for the plaintiffs.

BOGDANSKI, J. This appeal requires this court to construe portions of General Statutes § 31-349, which governs payments to disabled employees from the Second Injury and Compensation Assurance Fund. The respondents, the H. O. Penn Machinery Company (the Penn Company) and the Aetna Casualty and Surety Company (Aetna), appealed to the Superior Court from an award of the workmen's compensation commissioner at large. From the judgment dismissing the appeal, the respondents have appealed to this court and the defendant Second Injury and Compensation Assurance Fund has cross appealed.

On April 15, 1970, Paul C. Jacques injured his right knee in the course of his employment with the Penn Company. Immediately after surgery for his knee on October 29, 1970, Jacques died of a coronary occlusion. The compensation commissioner found that Jacques' death resulted from the surgery and ordered the respondents to pay Jacques' burial expenses and to pay weekly compensation benefits to his dependents. The respondents did not contest the compensability of Jacques' injury and his subsequent death.

The commissioner also found that Jacques had had arteriosclerotic heart disease, of which he had been unaware. The existence of the heart disease was first discovered during the autopsy. The respondents contended that the heart disease was a "pre-existing permanent physical impairment," within the meaning of General Statutes § 31-349, and that Jacques' death would not have occurred except for that impairment. Accordingly, they argued, § 31-349 limited their liability to 104 weeks. The commissioner denied both claims of the respondents. On appeal, however, the Superior Court concluded that Jacques' arteriosclerotic heart disease did constitute a "pre-existing permanent physical impairment" within the meaning of General Statutes § 31-349. But the court also held that the commissioner had not erred in refusing to find that his death would not have occurred except for that impairment.

In its cross appeal the second injury fund argues that Jacques' arteriosclerotic heart disease was not a "pre-existing permanent physical impairment" because it had not manifested itself during his life or, alternatively, because his employer had no prior knowledge of the heart disease. In their appeal the respondents claim that the medical evidence required a finding that the death would not have occurred in the absence of his heart disease.

To prevent discrimination against handicapped workers, while providing the benefits of workmen's compensation to such workers, virtually every state has enacted some form of second injury fund legislation. See *Lawson* v. *Suwannee Fruit & Steamship Co.*, 336 U.S. 198, 69 S. Ct. 503, 93 L. Ed. 611 (involving the second injury fund provisions of the federal

Longshoremen's and Harbor Workers' Compensation Act) ; 2 Larson, Workmen's Compensation Law § 59.31, p. 88.119. Such legislation is also designed to relieve employers from the hardship of liability for those consequences of compensable injury not attributable to their employment. 2 Larson, op. cit. § 59.33, p. 88.153. In the early days of workmen's compensation, employers were often held liable for the full consequences of work-related accidents suffered by their employees, even though those consequences were aggravated by preexisting disabilities. For example, in *Fair* v. *Hartford Rubber Works Co.,* 95 Conn. 350, 111 A. 193, a one-eyed employee who lost the sight of his remaining eye in a compensable accident was held to be entitled to compensation for his total incapacity rather than to the lesser sum specifically provided in the Workmen's Compensation Act for the loss of one eye. As a result of such holdings, compensation insurance premiums on handicapped employees increased significantly. Employers had a strong economic incentive for firing and refusing to hire handicapped employees.[1] 2 Larson, op. cit. § 59.31, pp. 88.118, 88.119.

Legislative response was not long in coming. In Connecticut, the rule of *Fair* v. *Hartford Rubber*

---

[1] "Perhaps the most impressive evidence of the force behind these statements is that offered by Mr. I. K. Huber of Oklahoma. *Nease* v. *Hughes Stone Co.,* 114 Okla. 170, 244 P. 778, held the employer liable for total compensation for loss of the second eye. After the decision, Mr. Huber reports, 'thousands of one-eyed, one-legged, one-armed, one-handed men in the State of Oklahoma were let out and can not get employment coming under the workmen's compensation law of Oklahoma. . . . The decision displaced between seven and eight thousand men in less than 30 days in Oklahoma.' " *Lawson* v. *Suwannee Fruit & Steamship Co.,* 336 U.S. 198, 203–204, 69 S. Ct. 503, 93 L. Ed. 611.

*Works Co.*, supra, was statutorily abandoned in favor of an apportionment scheme;[2] see *Cashman* v. *McTernan School, Inc.*, 130 Conn. 401, 404, 34 A.2d 874; *Henry* v. *Keegan*, 121 Conn. 71, 74–76, 183 A. 14; and employers were permitted to condition the employment of handicapped workers on their written waiver of any future compensation attributable to their physical defects. General Statutes § 31-325. The legislature thus removed the reason for discrimination against handicapped workers and protected the employer from hardship. But handicapped employees were deprived of adequate protection in the event of a second disability.

To remedy that situation this state adopted second injury fund legislation in 1945. Public Acts 1945, No. 188. The present statutory provisions, General Statutes §§ 31-349 to 31-355, are the product of considerable evolution. Originally, only employees who had previously incurred "permanent partial incapacity by means of the total loss of, or the total loss of use of, one hand, one arm, one foot, one leg or one eye, or the reduction of sight in one eye to one-tenth or less of normal vision with glasses," had recourse to the second injury fund. Public Acts

---

[2] See General Statutes § 31-307, which states, in part, that "an employee who has suffered the loss or loss of the use of one of the members of his body, or part of one of the members of his body, or the reduction of vision in one eye to one-tenth or less of normal vision, shall not receive compensation for the later injury in excess of the compensation allowed for such injury when considered by itself and not in conjunction with the previous incapacity except as hereinafter provided." (The phrase "except as hereinafter provided" was first added in 1961 by Public Act No. 491.) Moreover, General Statutes § 31-275 provides: "In the case of aggravation of a pre-existing disease, compensation shall be allowed only for such proportion of the disability or death due to the aggravation of such pre-existing disease as may be reasonably attributed to the injury upon which the claim is based."

1945, No. 188. In 1959 the General Assembly deleted all reference to specific disabilities, so that the second injury fund statute applied to any employee with a previously incurred "permanent partial incapacity." Public Acts 1959, No. 580. In 1967 the General Assembly substituted the present statute, which applies to any employee "who has previously incurred, by accidental injury, disease or congenital causes, total or partial loss of, or loss of use of, one hand, one arm, one foot or one eye, or who has other [preexisting] permanent physical impairment." General Statutes § 31-349. The new term, "permanent physical impairment," is not defined in the statute.

Any covered employee who "incurs a second disability by accident or disease arising out of and in the course of his employment, resulting in a permanent disability caused by both conditions which is materially and substantially greater than that which would have resulted from the second injury alone, . . . shall receive compensation for the entire amount of disability, including total disability, and necessary medical care, . . . notwithstanding the fact that part of such disability was due to prior accidental injury, disease or congenital causes." General Statutes § 31-349. By following the prescribed procedures, the employer may limit his liability to payments due in the first 104 weeks of the employee's second disability, after which the second injury fund assumes responsibility for compensation and medical treatment. Another portion of § 31-349 specifically governs death benefits: "If the subsequent injury of such an employee resulting from an accident arising out of and in the course of his employment shall result in the death of the

employee, and it shall be determined that either the injury or death would not have occurred except for such preexisting permanent physical impairment," the employer is entitled to limit his liability to funeral expenses plus death benefits for the first 104 weeks. General Statutes § 31-349.

Our first task is to determine whether the phrase "permanent physical impairment" must be construed to include the decedent's heart disease, although that disease had neither manifested itself so as to be a hindrance to obtaining employment nor come to the attention of the employer.[3] The courts of several jurisdictions have read one or the other requirement into statutes similar to our

[3] The legislative history of the present second injury fund statute and its predecessors is not, unfortunately, instructive as to the meaning of the phrase "permanent physical impairment." General Statutes § 31-349 is similar in some respects to the model statute proposed by the drafters of the Council of State Governments' Workmen's Compensation and Rehabilitation Law, but the model statute expressly provides that reimbursement from the second injury fund is available only if the employer establishes by written records that he had knowledge of the employee's impairment. See 2 Larson, Workmen's Compensation Law § 59.33, pp. 88.153, 88.154. General Statutes § 31-349 on its face contains no such restriction and is not obviously unworkable without it. It is true that nontechnical statutory words and phrases are to be construed "according to the commonly approved usage of the language." General Statutes § 1-1 (a). Such guidance is often of little help, however, since words seldom have precise and unvarying meanings. See, for example, *Hartford Electric Light Co.* v. *Sullivan,* 161 Conn. 145, 150, 285 A.2d 352; *Mack* v. *Saars,* 150 Conn. 290, 294, 188 A.2d 863. The word "impairment" in workmen's compensation legislation reasonably might include the notion of some degree of manifestation in the workplace, or it might not. It is necessary to look beyond the express words of General Statutes § 31-349 to whatever sources might aid in its interpretation, including its legislative history, its purpose, and the construction given similar statutes in other jurisdictions. *United Aircraft Corporation* v. *International Assn. of Machinists,* 161 Conn. 79, 85, 285 A.2d 330; *Mack* v. *Saars,* supra.

own. The New York statute also employs the phrase "permanent physical impairment," defining it to mean "any permanent condition due to previous accident or disease or any congenital condition which is or is likely to be a hindrance or obstacle to employment." N.Y. Workmen's Comp. Law § 15 (8) (b). The New York Court of Appeals has implied a requirement that the employer have knowledge of the employee's impairment and a good faith belief of its permanency. *Matter of Bellucci* v. *Tip Top Farms, Inc.,* 24 N.Y.2d 416, 420, 248 N.E.2d 864. The court reasoned (pp. 419–20): "That *some* knowledge by the employer of the permanent and disabling nature of the pre-existing impairment of its employee is required by section 15 (subd. 8) . . . is indicated by the express policy of the statute to encourage employment of the handicapped. This policy is based upon the reluctance of employers to hire or retain employees whose possible subsequent injuries could result in increased financial burdens upon the employer because of the existence of a prior permanent impairment. Obviously, the legislature would have no need to encourage employment of workers whose impairments are unknown to employers since such workers would meet no special barriers to general employment." Other courts have not required actual employer knowledge, but have reasoned that the policy of second injury fund legislation requires them to distinguish between "manifest" and "latent" preexisting conditions. See *American Mutual Ins. Co. of Boston* v. *Jones,* 426 F.2d 1263, 1267 (D.C. Cir.); *Boyd-Campbell Co.* v. *Shea,* 254 F. Sup. 483, 486 (S.D. Tex.); *United States Fidelity & Guaranty Co.* v. *O'Keeffe,* 240 F. Sup. 813, 815–16 (S.D. Fla.); *Scott* v. *Alaska Industrial Board,* 91 F. Sup. 201, 203 (D. Alas.).

Not all courts, however, have been willing to import distinctions into second injury fund statutes which do not in terms require them. The Supreme Court of California, for example, expressly rejected the New York employer-knowledge rule in *Ferguson v. Industrial Accident Commission,* 50 Cal. 2d 469, 475–79, 326 P.2d 145, and held that the previous condition need only be "labor disabling." In a later case, *Subsequent Injuries Fund v. Industrial Accident Commission,* 56 Cal. 2d 842, 366 P.2d 496, the court also held that the "previous disability or impairment" need never have been previously manifested, even to the afflicted employee himself. The court pointed out (p. 846) that a preexisting condition which has not interfered with employment is still labor disabling if it "can reasonably be expected to handicap an employee's ability in the general labor market to get and hold a new job, . . . should [he] be displaced from the job he has had." See also *Subsequent Injury Fund v. Rinehart,* 12 Md. App. 649, 653, 280 A.2d 298.

In our view, the sounder approach to General Statutes § 31-349 is exemplified by the California cases. As argued in 2 Larson, Workmen's Compensation Law § 59.33, p. 88.153, the requirement of manifestation or employer knowledge "is defensible only if it is assumed that the exclusive purpose of the second injury principle is to encourage the hiring of the handicapped. This is, of course, the central purpose—but the principle also embraces the idea of achieving this result in a way that works hardship on neither the employer nor the employee. If one did not care about incidental hardship to the employee, one could do the hire-the-handicapped job by merely using an apportionment statute [such as General Statutes §§ 31-307 and 31-275, referred

to in footnote 2]. And if one cares about the element of hardship to the employer, one could argue the employer ought to be relieved of the cost of the preexisting condition, whether he knew of it or not [and whether it had manifested itself or not], purely on the ground that the cost of this impairment, not having arisen out of this employment, should not in fairness fall upon this employer." Its history, summarized above, convinces us that second injury fund legislation in this state was enacted to serve all three of the purposes which Larson identifies. The employer-knowledge and manifestation rules must be rejected if the goal of alleviating the burden on employers while assuring full protection for employees is to be achieved.

Moreover, our adoption of an employer-knowledge or manifestation rule without legislative guidance would give rise to a proliferation of subsidiary legal questions necessitating future litigation. 2 Larson, loc. cit., mentions a few of the questions which the New York courts have been forced to answer in various factual settings: How much must the employer have known about the actual nature of the prior injury? How does the employer acquire the requisite actual knowledge? What constitutes knowledge on the part of a corporation? The manifestation rule would also present difficulties in application, since "manifestation" is itself an ambiguous concept. See, e.g., *American Mutual Ins. Co. of Boston* v. *Jones*, supra.

We next consider the respondents' claim that the compensation commissioner erred in refusing to find, from the medical evidence presented to him, the negative fact that the decedent's "death would not have occurred except for . . . [his] pre-existing

permanent physical impairment," thereby subjecting the fund to liability for death benefits under General Statutes § 31-349. We find the test to be whether the preexisting impairment was an essential factor in causing the death. General Statutes § 31-349 does not require the commissioner to speculate as to whether the employee's death might have occurred as a result of factors for the existence of which there is no evidence whatsoever.

On appeal from a finding and award of a compensation commissioner, the court does not retry the case. Practice Book § 435; *Wheat* v. *Red Star Express Lines,* 156 Conn. 245, 249, 240 A.2d 859. The Superior Court properly refused to evaluate the medical testimony and find that Jacques' heart disease had caused his death where the commissioner had declined to make such a finding. As this court said in an appeal from a decision of a panel of unemployment commissioners, "[i]t often happens, as it did in the case at bar, that evidence as to certain claimed facts which are neither admitted nor undisputed is presented to the commissioner, who makes no finding thereon and who subsequently, by denying a motion to correct, refuses to add the requested facts to his finding. When under such circumstances the existence or nonexistence of a fact is material to the question of law which the proponent of the evidence desires to raise on appeal, the Superior Court is powerless . . . to add the fact to the finding." *Lanyon* v. *Administrator,* 139 Conn. 20, 29, 89 A.2d 558.[4] The

[4] The Uniform Administrative Procedure Act modifies the apparent finality of this rule in certain circumstances. General Statutes § 4-183 (g) provides that on appeal from an agency action the Court of Common Pleas "may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administra-

respondents try to escape the operation of the foregoing principle by treating the commissioner's refusal to find causation as an affirmative finding of a medical fact without sufficient evidentiary basis, citing *Murchison* v. *Skinner Precision Industries, Inc.,* 162 Conn. 142, 151–52, 291 A.2d 743. The failure to find a fact claimed to have been proved is not equivalent to an affirmative finding of the opposite, however, and does not require a grounding in evidence. *Triano* v. *United States Rubber Co.,* 144 Conn. 393, 396–97, 132 A.2d 570.

There is no error in the appeal or in the cross appeal.

In this opinion the other judges concurred.

tive findings, inferences, conclusions, or decisions are: . . . (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." The appeal in the case at bar was not taken pursuant to the Uniform Administrative Procedure Act.