INTERNATIONAL BUSINESS MACHINES CORPORATION *v.* F. GEORGE BROWN, TAX COMMISSIONER

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, JS.

Argued June 4—decision released August 20, 1974

*Peter A. Kelly,* with whom was *Robert K. Ciulla,* for the plaintiff.

*Richard K. Greenberg,* assistant attorney general, with whom were *Ralph G. Murphy,* assistant attorney general, and, on the brief, *Robert K. Killian,* attorney general, for the defendant.

MacDonald, J. The present case comes to us by reservation from the Court of Common Pleas seeking the advice of this court as to the correct interpretation of § 12-407 (7) of the General Statutes, being a portion of chapter 219, the Education, Welfare and Public Health Tax, commonly referred to as the Sales and Use Tax Act. The specific question presented is whether "[t]he transfer of possession of tangible personal property back to plaintiff-taxpayer from an out of state subcontractor who for consideration applied skilled labor to said property supplied by the plaintiff-taxpayer, the

title to which remained in the plaintiff-taxpayer throughout," is a "purchase" as defined in § 12-407 (7) for purposes of computing the use tax base of the plaintiff taxpayer. For the reasons enumerated below we conclude that it is not.

The plaintiff's action, appealing a determination of the defendant tax commissioner, was reserved for the advice of this court upon the following stipulation of facts: The plaintiff, International Business Machines Corporation, hereinafter called IBM, a New York corporation with its principal place of business in Armonk, New York, is authorized to do business in Connecticut and is principally engaged in the manufacturing and marketing, for sale and lease, of computers and associated equipment. When IBM brings its equipment into Connecticut for storage, use or consumption, it is required to pay a use tax on that equipment. IBM's manufacturing and processing operations concerning computers frequently comprise the following activities: (1) purchase of materials, basic components and completed assemblies from vendors; (2) fabrication, processing and assembly within its facilities and by its own employees of said materials, component parts and assemblies; (3) furnishing of certain component parts to outside contractors who further fabricate or process them to IBM's specifications for a fee; and (4) further processing and final assembly by IBM of all materials, components and assemblies into a finished machine. None of IBM's manufacturing and processing operations at issue herein takes place within Connecticut. On December 6, 1971, the tax commissioner of the state of Connecticut, hereinafter called the commissioner, issued to IBM's Data Processing Division an assessment of additional sales and use taxes for the

period extending from June 30, 1968, through June 30, 1971, in the amount of $79,052.06, together with interest of $13,011.13, for a total assessment of $92,063.19.

IBM filed a petition for reassessment protesting such additional assessment and, after a hearing, received a letter from the commissioner stating that the aforesaid assessments were found to be proper. Thereafter, IBM received a statement of amount due on sales and use tax, reaffirming the position of the commissioner as stated and showing additional taxes due in the amount of $79,052.06, together with interest of $16,568.47, for a total amount claimed to be due of $95,620.53. IBM appealed this deficiency assessment to the Court of Common Pleas, the sole legal issue being the proper measure of IBM's use tax base for equipment it brings into Connecticut, it being IBM's claim that the proper measure of the use tax base on its machines is the purchase price paid by IBM for component materials and that the costs of out-of-state subcontract labor should not be included in such base. The commissioner, on the other hand, claims that the cost of such labor performed on certain component materials must be included in IBM's use tax base on its machines in addition to the purchase price of the component materials. The parties have stipulated that if the appeal is dismissed, the deficiency assessment in the amount of $79,052.06 plus statutory interest is correct, and that if the appeal is sustained, IBM is entitled to a refund of $4,049.06.

Essentially, the issue presented is whether the use tax, levied upon an out-of-state manufacturing concern when its products enter the state for use, stor-

age or consumption, should include within its ambit the cost of labor performed upon component materials without the state, or whether it should apply solely to the cost to the taxpayer of those component materials when originally purchased. The pertinent sections of the Sales and Use Tax Act relating to this issue are printed in the footnote.[1] Both parties have noted in their briefs that if the subcontract work were performed in Connecticut the sales tax provisions would include the cost of this intermediary labor in its tax base. This is the result of the inclusion of the following subsection within the statutory definition of "sale" in § 12-407 (2) (c): "the producing, fabricating, processing, printing or imprinting of tangible personal property for a consideration for consumers who furnish either directly or indirectly the materials used in the producing, fabricating, processing, printing or imprinting . . . ."

---

[1] "[General Statutes] Sec. 12-408. THE SALES TAX. (1) IMPOSITION AND RATE OF SALES TAX. For the privilege of making any sales as defined in subsection (2) of section 12-407, at retail, in this state for a consideration, a tax is hereby imposed on all retailers at the rate of . . . [six and one-half] per cent of the gross receipts of any retailer from the sale of all tangible personal property sold at retail . . . ."

. . . . .

"[General Statutes] Sec. 12-411. THE USE TAX. (1) IMPOSITION AND RATE. An excise tax is hereby imposed on the storage, use or other consumption in this state of tangible personal property, purchased from any retailer for storage, use or other consumption in this state at the rate of . . . [six and one-half] per cent of the sales price of the property."

. . . . .

"[General Statutes] Sec. 12-407. DEFINITIONS. Whenever used in this chapter:

. . . . .

"(2) 'Sale' and 'selling' mean and include: (a) Any transfer of title, exchange or barter, conditional or otherwise, in any manner

By contrast, the definition of "purchase," § 12-407 (7), which is central to the operation of the use tax; see *Stetson* v. *Sullivan*, 152 Conn. 649, 211 A.2d 685; does not contain a similar provision. The commissioner urges this court to construe the language in the definition of "purchase" to achieve a result similar to that obtained in connection with the definition of "sale" under § 12-407 (2) (c). The court notes in passing that although the Sales and Use Tax Act (originally and optimistically described by its sponsors as a "temporary tax") has existed within this state for twenty-seven years, this particular issue apparently is one of first impression.

A brief excursion into the history and purpose of the act may better illustrate the area of dispute. The Sales and Use Tax Act was adopted by the General Assembly as an emergency measure to generate revenue during the post-war period when a wave

---

or by any means whatsoever, of tangible personal property for a consideration; . . . (c) the producing, fabricating, processing, printing or imprinting of tangible personal property for a consideration for consumers who furnish either directly or indirectly the materials used in the producing, fabricating, processing, printing or imprinting; . . . (f) a transaction whereby the possession of property is transferred but the seller retains the title as security for the payment of the price; (g) a transfer for a consideration of the title of tangible personal property which has been produced, fabricated or printed to the special order of the customer, or of any publication . . . .

     •      •      •      •      •

"(7) 'Purchase' means and includes: (a) Any transfer, exchange or barter, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property . . . for a consideration; (b) a transaction whereby the possession of property is transferred but the seller retains the title as security for the payment of the price; (c) a transfer for a consideration of tangible personal property which has been produced, fabricated or printed to the special order of the customer, or of any publication."

of social legislation extended the state's budget beyond the bounds of existing revenue measures. See S. Proc., Pt. 2, 1947 Sess., p. 250. The prime revenue source decided upon was the sales tax. The use tax was created as a complementary measure to insure the equitable diffusion of the tax burden upon both in-state purchases of tangible personal property and out-of-state purchases of tangible personal property where such property is used, stored or consumed within the state, thus being, in a certain sense, a gap-filling measure. As such, it would merit a liberal construction to achieve such purposes. However, the court is not convinced that, even given such a construction, the tax should apply in this instance.

The Sales and Use Tax Act is no stranger to this court, and we have had occasion to describe it in the past. "The two taxes, though imposed by the same act, are distinct. 'A sales tax and a use tax in many instances may bring about the same result. But they are different in conception, are assessments upon different transactions, and in the interlacings of the two legislative authorities within our federation may have to justify themselves on different constitutional grounds. A sales tax is a tax on the freedom of purchase . . . . A use tax is a tax on the enjoyment of that which was purchased.' *McLeod* v. *Dilworth Co.,* 322 U.S. 327, 330, 64 S. Ct. 1023, 88 L. Ed. 1304. Whether or not the two shall have precisely the same scope is for the determination of the legislature." *Connecticut Light & Power Co.* v. *Walsh,* 134 Conn. 295, 300, 57 A.2d 128.

There are three subparts to the definition of "purchase" under § 12-407 (7). Subsection (a) is

the general, definitional section; subsections (b) and (c) apply to more specific situations. To constitute a purchase within subsection (a) there must exist three conditions: (1) any transfer, exchange or barter, conditional or otherwise, in any manner or by any means, whatsoever, (2) of tangible personal property, (3) for a consideration. Absence of any one of the three conditions is sufficient to exclude a transaction from this subsection. Both parties argue at considerable length in their briefs that the essential issue is whether the transaction involved is a "transfer." However, it is unnecessary to decide whether the plaintiff's reacquisition of its property was a "transfer" within the meaning of that term as used in the statute since what the plaintiff obtained was its own property and what it "purchased" was not tangible personal property but solely the labor of the subcontractor. As has been noted by the California Supreme Court, construing a statute identical to our Sales and Use Tax Act with respect to these particular provisions, there already is provision for assessing a use tax upon the value of the component materials obtained for use within the taxing state. See *Chicago Bridge & Iron Co.* v. *Johnson*, 19 Cal. 2d 162, 119 P.2d 945.[2] As a

---

[2] The California Supreme Court noted in dicta (p. 167) that the value of labor in the out-of-state production of a finished marketable item from component materials is excluded from the use tax base: "It is quite true that the tanks, or the completed but unassembled parts, which were shipped to this state were not purchased by the plaintiff in that form; they were manufactured by it. It acquired the raw materials out of which it manufactured or fabricated those completed parts, and it is the storage and use of those materials upon which the tax is based. The tax was computed upon the cost, that is, the sales price of these materials to plaintiff, and that is the price which it paid for them. The fabrication and construction of these materials into the completed articles undoubtedly enhanced their value, but the tax is not calculated on that value. It is based

matter of fact, this follows what had been the interpretation of the tax commissioner in this state since 1962.[3]

Tangible personal property is defined in § 12-407 (13) as follows: " 'Tangible personal property' means personal property which may be seen, weighed, measured, felt or touched or which is in any other manner perceptible to the senses." "Personal property" has been defined by this court, with respect to its taxation under a different tax provision, in these words: " 'The word "property", as that term is used in the statutes relating to assessment and taxation, refers to every species of valuable right or interest which is subject to ownership,

on the sales price to plaintiff of the materials which were used to fabricate the finished product which materials were undeniably purchased by plaintiff."

The commissioner concedes that the value of labor performed by IBM at its own out-of-state plant similarly would be excluded from its use tax base. However, the exclusion of the value of such labor, while including the value of labor performed by subcontractors not on IBM's premises, would create an anomaly no less great than that which exists presently where the sales tax, if applicable, would take cognizance of the subcontract labor in its tax base.

[3] IBM cites, in its brief, a letter from the tax commissioner indicating as follows his prior determination on this issue: "Please be advised that an out of state concern that manufactures property to be leased into Connecticut, is liable to the payment of the Connecticut Use Tax on such leased property measured at 3-1/2% [now 6-1/2%] of the purchase price of the materials which comprise said leased property. The theory, of course, being that said materials are purchased for use in this state *even though their form may be changed prior to said use*." (Emphasis in plaintiff's brief.) Letter from Tax Commissioner to Commerce Clearing House, Inc., June 15, 1962; CCH State Tax Rep., Conn. ¶ 60-150.50 (1962). The fact that this was the prior interpretation placed upon the statute by the commissioner, who is charged with the enforcement of the statute, is entitled to weight in its construction. *State* v. *Sober*, 166 Conn. 81, 90, 347 A.2d 61; *Leach* v. *Florkosky*, 145 Conn. 490, 495, 144 A.2d 334; *Clark* v. *Town Council*, 145 Conn. 476, 485, 144 A.2d 327.

or that which has an exchangeable value or which goes to make up one's wealth or estate; all things which have a pecuniary value. "Property" says Webster, "in a broad sense, is any valuable right or interest considered primarily as a source or element of wealth." ' *Kansas City Life Insurance Co.* v. *Hammett,* 177 La. 930, 934, 149 So. 525." *Eric* v. *Walsh,* 135 Conn. 85, 90, 61 A.2d 1. Subcontract labor is not "tangible personal property."

It is nothing more than labor which was supplied to IBM from the subcontractor for a consideration, that consideration being the value of such labor. The commissioner's argument that this consideration satisfies the third condition within the definition of purchase in subsection (a) is not persuasive. The statute clearly imports that the consideration to which it refers is that which is given in the transfer, exchange or barter for the tangible personal property, and not any consideration given for the subcontract labor to which the passage of the tangible personal property, here the component materials, is merely an incident.

The essence of the transaction between IBM and the subcontractor is the performance of skilled labor, and the passage of the component materials, from IBM to the subcontractor and then back to IBM, is merely incidental to such performance and is not a purchase. In *United Aircraft Corporation* v. *O'Connor,* 141 Conn. 530, 107 A.2d 398, we had occasion to consider a similar issue. There the taxpayer was challenging the assessment of a sales tax on materials valued in excess of one million dollars, purchased by it for use in certain government contracts, essentially to apply skilled engineering services. A provision of its contracts with the

government vested title in the government to all parts, materials, inventories, work in process and non-durable tools theretofore acquired or produced, in performance of the contracts, upon partial payment under the contract by the government. The taxpayer claimed that this provision constituted a sale at retail of these materials to the government, thus rendering its initial purchase of the materials a purchase for resale as defined by § 329i (3½) of the 1947 Supplement [now General Statutes § 12-407 (3)], and therefore exempt from taxation, and we agreed, stating (p. 539): "The delivery [to the government by means of the above-described clause] of such property is not a sale at retail under the act if it is merely incidental to a special service performed for the purchaser." We noted also in that case (p. 537) with regard to defining "sale" under the act that, "[t]his statutory definition controls the characterization of the transaction in the case at bar, regardless of whether a similar result would ensue upon the application of principles of common law."

The commissioner further claims that since subcontract labor is included within the tax base where the sales tax pertains, by virtue of § 12-407 (2) (c), the general purpose of the use tax, to complement the sales tax in out-of-state purchase situations, mandates that the construction of the term "purchase" reach the same result. The commissioner's argument is appealing in that such a construction would close an apparent gap in our laws. However, "[w]here the wording is plain, we will not speculate as to any supposed intention [of the legislature]. *Jack* v. *Torrant,* 136 Conn. 414, 418, 71 A.2d 705. We cannot read something into a statute in order to reach a just result. *State* v. *Malm,* 143

Conn. 462, 467, 123 A.2d 276. . . . [The words used] must be construed according to the commonly approved usage of the language. General Statutes § 1-1; *Klapproth* v. *Turner,* 156 Conn. 276, 280, 240 A.2d 886; *State* v. *Laffin,* 155 Conn. 531, 535, 235 A.2d 650." *State* v. *Briggs,* 161 Conn. 283, 286–87, 287 A.2d 369. "When the language used in a statute is clear and unambiguous, its meaning is not subject to modification by construction. *State* v. *Simmons,* 155 Conn. 502, 504, 234 A.2d 835; *Hurlbut* v. *Lemelin,* 155 Conn. 68, 73, 230 A.2d 36. It is not the function of courts to read into clearly expressed legislation provisions which do not find expression in its words; *Lenox Realty Co.* v. *Hackett,* 122 Conn. 143, 150, 187 A. 895; nor is it our function to substitute our own ideas of what might be a wise provision in the place of a clear expression of the legislative will. *Connelly* v. *Bridgeport,* 104 Conn. 238, 249, 132 A. 690. The statute must be applied as its words direct. *Obuchowski* v. *Dental Commission,* 149 Conn. 257, 265, 178 A.2d 537." *Dental Commission* v. *Tru-Fit Plastics, Inc.,* 159 Conn. 362, 365, 269 A.2d 265. When legislation contains a specific definition, the courts are bound to accept that definition. *Danbury* v. *Corbett,* 139 Conn. 379, 384, 94 A.2d 6.

Had the legislature intended the definition of purchase to encompass the specific provision under consideration (§ 12-407 [2] [c]) it could have done so by direct inclusion of such language within § 12-407 (7) and its failure to do so can be construed only as the deliberate intent of the legislature to omit the situations governed by § 12-407 (2) (c) from the purview of § 12-407 (7). That the legislature, in the same session and in the same act, spelled out both definitions serves to underscore this conclusion.

" 'There is a presumption that the legislature, in enacting a law, did so in view of existing relevant statutes and intended it to be read with them so as to make one consistent body of law.' *Hurlbut* v. *Lemelin*, . . . [155 Conn. 68, 74, 230 A.2d 36]; *Adams* v. *Vaill*, . . . [158 Conn. 478, 483, 262 A.2d 169]. This is particularly so when all statutes are dealt with in the same session. *Hurlbut* v. *Lemelin,* supra; *Knights of Columbus Council* v. *Mulcahy,* 154 Conn. 583, 590, 227 A.2d 413." *Collins* v. *York,* 159 Conn. 150, 162, 267 A.2d 668.

The same principles apply to the commissioner's argument that § 12-407 (7) (c) is an analogue to § 12-407 (2) (c). Section 12-407 (2) (g) is identical to § 12-407 (7) (c), the word "title" within § 12-407 (2) (g) merely defining the instance of the subsection's operation. To reach the conclusion urged by the commissioner would render subsection (2) (c) superfluous, since the result it achieved would arise by implication from subsection (2) (g). "In construing a statute, no clause, sentence or word shall be treated as superfluous, void or insignificant unless there are compelling reasons why this principle cannot be followed." *Niedzwicki* v. *Pequonnock Foundry,* 133 Conn. 78, 82, 48 A.2d 369. No such compelling reasons appear in this case.

We agree that there is a disparity between the statutory definitions of "sale" and "purchase." However, it is not our province to fill every legislative gap. The commissioner's arguments, that the use tax should extend to this situation, are not without merit. "These are all arguments which might better be advanced before the General Assembly. Questions of policy are for its consideration. We

can only take the statutes as they have been enacted." *Consolidated Diesel Electric Corporation v. Stamford,* 156 Conn. 33, 39, 238 A.2d 410.

We answer the question presented, "No."

No costs shall be taxed in this court for or against any party.

In this opinion the other judges concurred.