JANE DOE *v.* INSTITUTE OF LIVING, INC., ET AL.

HOUSE, C. J., LOISELLE, BOGDANSKI, LONGO and SPEZIALE, Js.

Argued December 7, 1977—decision released May 2, 1978

*Stephen Wizner,* with whom were *Mary F. Keller* and, on the brief, *Dennis E. Curtis,* for the plaintiff.

*Edward F. Hennessey,* with whom was *James A. Wade,* for the defendants.

LOISELLE, J. This case comes to the court on reservation upon stipulation from the Superior Court in Hartford County.[1] The material facts

[1] The questions reserved to this court are as follows:

"1. Is the Institute of Living a 'private hospital, public hospital or corporation' within the meaning of that term as contained in § 4-104 of the Connecticut General Statutes (Rev. 1958)?

"2. If the answer to (1) is yes, is the Institute of Living receiving 'state aid' within the meaning of the aforesaid § 4-104?

"3. Is a psychiatric record, such as that maintained by the Institute of Living for each of its patients, a 'hospital record' within the meaning of that term as contained in the aforesaid § 4-104?

"4. If the Institute of Living is covered by the provisions of the aforesaid § 4-104, does the court have discretion, on a case-by-case basis, to determine whether or not the records of a psychiatric patient should be turned over to that patient?

"5. If the answer to (4) is yes, (a) what is the standard to be applied by the court in exercising such discretion? (b) must the Institute of Living turn over to the former patient the entire psychiatric record of such patient?"

stipulated to may be summarized as follows: The Institute of Living is a private, nonprofit institution for the care and treatment of mentally ill persons. Founded by the Connecticut Medical Society, it was given its charter in 1822 by the General Assembly and received its first patients in 1824 under the name of the Connecticut Retreat for the Insane. In 1943, the charter was amended to change the facility's name to the Institute of Living. Currently, the Institute's operating income is derived from the payment received from patients, including payment by the welfare department for services rendered indigent patients,[2] gifts, funds for its outreach program in the division of child psychiatric services derived from a joint, annual fund-raising effort made by the Institute and several local hospitals, federal funds providing stipends for the training of some of the residents, and the income derived from its endowment. In addition, the Insti-

---

[2] The Institute in 1955 commenced handling a number of indigent patients who are receiving financial assistance from the state welfare department and are in need of treatment for mental illness. The Institute entered into an agreement with the welfare department under which the Institute is presently paid at the rate of $50.30 per patient per day as reimbursement for services rendered. This rate has increased from its initial level of $15.00 per patient per day in stages to its present level. Included in the rate is 30 cents per day to defer personal expenses of the patient himself. At the request of the welfare department, the maximum number of welfare patients in attendance at any one time is eight. The daily rate charged for welfare patients is all-inclusive. Unlike the daily rate charged private patients, the charge for welfare patients includes medications, the cost of craft materials, personal items, psychological testing, etc.

The welfare department is billed on a regular basis at the daily rate for each welfare patient being treated during the billing period. The Institute absorbs the difference between the $50.30 daily rate per patient charged the welfare department and its normal daily rate. During fiscal year 1974-1975 the Institute sustained a loss on welfare patients of approximately $61,000.

tute receives reimbursement from various governmental authorities for services rendered by its physicians.[3]

For over one hundred years the Institute has functioned without the benefit of state appropriations granted by the General Assembly. At the time of its inception, in 1822, the act of incorporation chartering the Institute authorized a conditional appropriation of $5000 provided the Institute raised an additional $15,000 privately. This appropriation was received in 1824. In 1845, 1853 and 1855, the General Assembly authorized payments to the Institute of $5000, $8000 and $6000, respectively, for building purposes. Additional payments were made by the General Assembly as fees for services rendered to enable the Institute to take care of the indigent insane until the establishment of the first state hospital in Middletown in 1868. The Institute has neither applied for appropriations made by the General Assembly for payment to psychiatric hospitals, nor does it receive any state or federal assistance for the care of its patients other than fees for services rendered to those patients. The Institute claims that an affirmative decision was made not to apply for state grants and appropriations on the basis of several factors including awareness of the provisions of General Statutes § 4-104 pertaining to the production of patient records by hospitals receiving state aid. As a matter of psychiatric practice, the Institute preferred not

---

[3] These agencies include the Connecticut department of corrections, the Hartford Retardation Clinic, high schools, the University of Connecticut and out-patient clinics.

to expose itself to the operation of this statute.[4]
The plaintiff concedes that she has no way of
determining the accuracy of the Institute's claimed
rationale for not seeking appropriations, but she
does not contest them.

The taxability of the Institute by the city of
Hartford has been a continuing subject of negotia-
tion and litigation.  As early as 1877, the city
imposed a tax of $7000 on the Institute for certain
sewers and other services which was continued
yearly.  See Braceland, The Institute of Living,
1822-1972, p. 111.  Then, in 1887, the Hartford asses-
sors imposed the so-called Washington School tax
which was continued at least through 1896.  Id.,
131.  This tax was later removed but it was restored
again in 1901 and the Institute paid property taxes
up through 1927.  Id., 175.

Revoked in 1927 for a decade, the tax was again
revived and in 1938 there began a struggle between
the Institute and the tax assessors for the city of
Hartford.  In that year this court ruled that the
Institute was a charitable institution.  While the
question of tax exemption was not at issue, it was
held that the retreat was "operated for the public
welfare without profit to itself or any individual."
*Boardman* v. *Burlingame,* 123 Conn. 646, 653–54,
197 A. 761.  In 1943 the Hartford board of tax
review voted to tax the Institute anew commencing
in 1944.  The Institute brought suit in the Court

---

[4] The additional factors noted in the stipulation are as follows:

"2.  The administrative costs and procedures involved in applying
for state aid together with obligations attendant thereon have been
a deterrent.

3.  The administrators of the Institute have taken the position
that as long as it can remain fiscally sound and independent, the
state money can be better spent on facilities more in need of same."

of Common Pleas, where the decision of the board of tax review was reversed in 1945; *Institute of Living* v. *Board of Tax Review,* 13 Conn. Sup. 372; and again the Institute was held tax exempt. The city of Hartford appealed this ruling to this court which reversed the lower court. In *Institute of Living* v. *Hartford,* 133 Conn. 258, 260, 50 A.2d 822, the court held that the Institute was not tax exempt because it was not "supported wholly or in part by state appropriations."

By 1951, the city property tax had risen to over $100,000. The superintendent of the Institute and its counsel appeared before the 1953 session of the General Assembly to attempt to obtain an exemption from local property taxes. Section 854c of the 1953 supplement to the General Statutes granted a property tax exemption to any "hospital society or corporation" which was on May 1, 1953, "supported wholly or in part by state appropriations." The General Assembly declined to remove the language limiting tax exemptions to state-supported hospitals. In 1955, however, the legislature enacted Public Act No. 130 which deleted the requirement of state support and extended exemption from local property taxes to all hospital societies and corporations. It is under this act, now General Statutes § 12-81 (16), that the Institute receives its current exemption from local property taxes.

The Institute retains psychiatric records on all of its patients. Such records, which contain both observed objective data and subjective data obtained by the treating psychiatrist from a variety of sources, are maintained under conditions of strict confidentiality. Stored and locked in the medical records section, the records are accessible only to

designated authorities immediately involved in a patient's treatment.[5]  The information contained in the records is imparted to others only with the express written consent of the patient and then only on a need-to-know basis, such as when a patient is under the treatment of another psychiatrist or when the patient is involved in litigation in which the mental records are relevant.  In the event that such information is given to the patient's attorney, it is done so only upon the representation that it will be maintained in confidentiality.

The plaintiff, a resident of the town of New Haven, was a patient at the Institute during the period of January 22, 1969, to April 25, 1970.  Following her discharge, the plaintiff, upon written application, sought the Institute's permission to examine and copy the records maintained on her during the period of her confinement.  The applications were denied and the plaintiff brought this action seeking an order, pursuant to General Statutes §§ 4-104 and 4-105, directing the defendants to produce such records.

General Statutes § 4-104 in part requires that "[e]ach private hospital, public hospital society or

[5] The stipulation specifies that "[a]ccess thereto is limited to the treating psychiatrist, staff psychiatrists engaged in group discussions of the patient's condition, medical or clinical doctors actually engaged in the diagnosis and treatment of a particular patient, the chief of the section for patients in his section, and possibly the social worker handling the patient's case if the need arises.  The superintendent of the Institute, who is also its chief medical officer and who must be a psychiatrist pursuant to the Institute's by-laws, has general authority to examine all patient records.  Nurses are shown only abbreviated admission notes to guide them in the care of the patient.  They do not see the psychiatric history.  The nurses might also be shown parts of the patient's physical record if there are peculiarities therein that warrant special attention for the patient's care."

corporation receiving state aid shall, upon the demand of any patient who has been treated in such hospital and after his discharge therefrom, permit such patient or his physician or authorized attorney to examine the hospital record." The first question reserved to this court is whether the Institute of Living is a "private hospital, public hospital society or corporation" within the meaning of § 4-104. The second question is whether the Institute is receiving "state aid" within the meaning of the same statute. If either of these questions is answered in the negative, then the Institute does not fall within the mandate of the statute. For the purposes of this opinion, we will assume that the Institute is a hospital within the meaning of §§ 4-104 and 4-105 and first address the issue of whether the Institute is the recipient of "state aid" within the meaning of the records inspection provisions.

The plaintiff claims that the Institute receives "state aid" in that it receives (a) a property tax exemption pursuant to General Statutes § 12-81 (16), (b) direct payments from the state pursuant to various contractual relations with a number of state offices and agencies, and (c) reimbursements from the state for services rendered to indigent patients, again pursuant to contractual arrangements with specific state agencies. The Institute, on the other hand, contends that the term "state aid" within General Statutes §§ 4-104 and 4-105, the record inspection provisions, refers specifically and solely to appropriations by the General Assembly for capital projects.

An interpretation of the language of a legislative enactment involves the question of "the expressed intention, that is, the intention of the legislative

body 'as found from the words employed to make it manifest.' " *Dana-Robin Corporation* v. *Common Council,* 166 Conn. 207, 221, 348 A.2d 560; *Park Regional Corporation* v. *Town Plan & Zoning Commission,* 144 Conn. 677, 682, 136 A.2d 785. Legislative intent is to be found not in what the legislature meant to say, but in the meaning of what it did say. *Lee* v. *Lee,* 145 Conn. 355, 358, 143 A.2d 154. As a general principle, a statutory term is to be given the meaning it has "according to the commonly approved usage of the language." General Statutes § 1-1 (a); *International Business Machines Corporation* v. *Brown,* 167 Conn. 123, 134, 355 A.2d 236; *Southington* v. *Southington Water Co.,* 80 Conn. 646, 658, 69 A. 1023. As this court has conceded, however, "[s]uch guidance is often of little help . . . since words seldom have precise and unvarying meanings." *Jacques* v. *H. O. Penn Machinery Co.,* 166 Conn. 352, 359n, 349 A.2d 847. Indeed, "[t]he particular inquiry is not what is the abstract force of the words or what they may comprehend, but in what sense were they intended to be understood or what understanding do they convey as used in the particular act." Sutherland, Statutory Construction (4th Ed.) § 46.07. Where the meaning of a statutory term is clear, it is said to be unambiguous and not subject to modification by construction. *Houston* v. *Warden,* 169 Conn. 247, 251, 363 A.2d 121. This principle is, however, somewhat deceptive, for a term which, in isolation, appears to be clear, may be modified by its context. Because "a word is merely a symbol which can be used to refer to different things," the thrust of statutory interpretation involves a determination of the referant, the words to which the term in question refers. Sutherland, op. cit. § 45.02.

Certain general principles facilitate this determination. First, statutes relating to the same subject matter may be looked to for guidance in reaching an understanding of the meaning of a statutory term. *New Haven* v. *United Illuminating Co.*, 168 Conn. 478, 485, 362 A.2d 785; *Levin-Townsend Computer Corporation* v. *Hartford*, 166 Conn. 405, 411, 349 A.2d 853. Further, it is to be presumed that the legislature, in enacting a law, "did so in view of existing relevant statutes and intended it to be read with them so as to make one consistent body of law." *Cicala* v. *Administrator*, 161 Conn. 362, 365, 288 A.2d 66; *State* v. *Jordan*, 142 Conn. 375, 378, 114 A.2d 694. Finally, "statutes should be construed so that no part of a legislative enactment is to be treated as insignificant and unnecessary, and there is a presumption of purpose behind every sentence, clause or phrase in a legislative enactment." *State ex rel. Kennedy* v. *Frauwirth*, 167 Conn. 165, 168, 355 A.2d 39; *Charlton Press, Inc.* v. *Sullivan*, 153 Conn. 103, 109, 214 A.2d 354. Following these general rules, we address the threshold question of the meaning of "state aid" within General Statutes §§ 4-104 and 4-105.

The ordinary meaning of the word "aid" is "help, assistance, succor, relief." Oxford English Dictionary (1971). The phrase "state aid" may, then, commonly refer to the assistance or support given by the state. See, e.g., *Beach* v. *Bradstreet*, 85 Conn. 344, 353, 82 A. 1030. However, as this court noted in *Corbin* v. *Baldwin*, 92 Conn. 99, 105, 101 A. 834, "[w]hile . . . the presumption is that the words of the statute were used in their ordinary signification, it does not necessarily follow that the term 'State aid' was not used [in the succession tax

statute] in some less comprehensive sense, or in [a] qualified and restricted sense." Thus, this court in the *Corbin* case, in concluding (p. 105) that the term "state aid" in the succession tax (1915 Public Acts, c. 332 § 3) included "tax exemption," first proceeded to a thorough "inquiry as to the legislative intent, involving a consideration of the language used, its context, pertinent antecedent legislative history, related legislation, the subject-matter with which the language deals, its operation as it may be interpreted, the conditions and circumstances under which it was enacted, and all other matters calculated to throw light upon the subject of inquiry." Indeed, the court specifically noted certain statutes in which the term "state aid," judging by the context, was used in the limited sense of aid by appropriations or direct payments. The binding force of this case, relied upon by both the plaintiff and the defendant, lies not in its conclusion that a tax exemption constitutes state aid, but that an understanding of the term within a specific statute is to be acquired through the process of statutory construction.

Accordingly, we examine first the context of General Statutes §§ 4-104 and 4-105. In their current form, these provisions fall into title 4, "Management of State Agencies," part II, "Budget and Appropriations." They constitute the fourth and fifth provisions in a series of six, all concerning hospitals, and each utilizing the term "state aid" or "aid from the state." Because these statutes are related, we may look to them for guidance in understanding the commonly used term "state aid." *New Haven* v. *United Illuminating Co.*, supra, 485; *Bania* v. *New Hartford,* 138 Conn. 172, 176–77, 83 A.2d 165. "Unless the context indicates otherwise, words or

phrases in a provision that were used in a prior act pertaining to the same subject matter will be construed to be used in the same sense." Sutherland, op. cit. § 51.02; see also *State ex rel. Hyde* v. *Dowe,* 129 Conn. 266, 271, 28 A.2d 12; *Beacon Falls* v. *Seymour,* 44 Conn. 210, 217.

The first in the relevant series of statutes, § 4-101, concerns appropriations by the General Assembly to hospitals.[6] Its concluding sentence reads: "Each such hospital receiving *state aid* shall be paid at a rate determined as provided by section 17-312 for the care and treatment of any patient when such expense is to be paid from state funds either directly or through the agency of any town or organization." (Emphasis added.) The statute referred to, § 17-312 (a), provides, in part, that "[t]he rate to be paid by the state to a hospital receiving appropriations granted by the general assembly shall be . . . ." When read together, these two provisions clearly convey that the term "state aid" is to be construed with reference to the substance of § 4-101 to mean "appropriations by the general assembly."

---

[6] "[General Statutes] Sec. 4-101. APPROPRIATIONS TO HOSPITALS. All appropriations to hospitals by the general assembly shall be expended under the direction of the governor and of the managers of such institutions, respectively, for the support of charity patients, and so used as to benefit the state as application is made from time to time, a report of which expenditures shall be made biennially to the general assembly; but no part of such appropriations shall be paid to any of such hospitals unless the same is in actual operation, unless the purpose for which an appropriation is to be expended is for a building and is so specified in the act making such appropriation. Each such hospital receiving state aid shall be paid at a rate determined as provided by section 17-312 for the care and treatment of any patient when such expense is to be paid from state funds either directly or through the agency of any town or organization."

The gist of the appropriations provision is that hospitals receiving the benefit of such appropriations are limited in the amount of reimbursement they are allowed to receive from the state. Equally, those subsequent provisions, including those here at issue, impose certain obligations upon hospitals receiving "state aid": § 4-102 concerns the annual reports state-aided hospitals are required to make, § 4-103 concerns the accounting system to be utilized by state-aided hospitals, §§ 4-104 and 4-105, those provisions now before this court, concern the inspection of hospital reports on patients, and § 4-106 requires such hospitals to treat patients suffering from venereal disease. Of particular importance is § 4-106, entitled "Treatment of venereal diseases in hospitals receiving state aid," which begins with the words, "[n]o hospital which receives appropriations made by the general assembly." Without dispute, by their own definition, both the first and last statutes of this series use "state aid" as a general term referring specifically to appropriations made by the General Assembly. Both the foregoing principles of statutory construction and basic logic require that the term is to be similarly interpreted in those provisions included in the same series.[7]

---

[7] The plaintiff looks to General Statutes § 4-107 to support a broader interpretation of the term "state aid." This provision, entitled "Institutions receiving state aid; visitation" provides: "Each private institution receiving, directly or by way of contract, any money from the state for purposes including the support or board of beneficiaries of the state, which refuses access to the proper board or official authorized by the state to visit such institution, shall forfeit all unpaid moneys or appropriations which it would otherwise have been entitled to receive from the state. All contracts with any such private institution made by the state, or by any authority acting for the state, shall be made subject to the provisions of this section." Clearly this provision was intended to have broader sweep than those previously mentioned. First, although it

The history of this series of statutes confirms this result. Sections 4-104 and 4-105 were originally enacted in 1927, Public Acts chapter 291, and appeared in the Revision of 1930, §§ 192, 193, within chapter 10, title 4, entitled "State and State-Aided Agencies." As now, the provisions followed immediately upon the appropriations statute, § 189, the hospital reports statute, § 190, and the accounting statute, § 191. With the exception of the accounting statute, which was enacted in 1929, each of these provisions was in existence at the time the legislature enacted the inspection of records statutes. Because the legislature is presumed to have acted with knowledge of prior relevant enactments, subsequent enactments are to be read in conjunction with such enactments in order to create one consistent body of law. *Lechner* v. *Holmberg,* 165 Conn. 152, 159, 328 A.2d 701; *Hurlbut* v. *Lemelin,* 155 Conn. 68, 74, 230 A.2d 36; *Knoll* v. *Kelley,* 142 Conn. 592, 594–96, 115 A.2d 678.

follows upon the series of statutes concerning state-aided hospitals, it specifically concerns not just hospitals, but all state-aided institutions. Second, its definition of state aid as it appears in the full text is broader than that derived from the relevant hospital provisions. The reason for such breadth is clear. The underlying purpose of § 4-107 is to allow state authorities to inspect all those "institutions" to which, for whatever reason, the care of individuals supported by the state is consigned. As early as 1918, this provision, in its current form, appeared in the General Statutes, Rev. 1918 § 1873, in a series of statutes concerning a range of institutions, including reformatories, correctional institutions, homes for the aged, and hospitals. Even before this, a similar provision appeared, Rev. 1902 § 2858, providing for the inspection of institutions by the state board of charity "to ascertain whether their inmates are properly treated." The state's interest in ensuring that its beneficiaries are receiving humane treatment warrants a statute of such breadth. The fact that § 4-107 accomplishes this purpose by explicitly defining "state aid" in terms broader than those used in the series concerning hospitals, does not mean that those provisions are equally to be broadly interpreted in the face of a contrary intention.

The appropriations statute, as it appeared in the 1930 revision of the General Statutes, contained the same wording as at present, with the exception that the final sentence read: "No such hospital [i.e., no hospital receiving appropriations] shall charge or receive more than four dollars per week for the care of any patient when such expense is to be paid by the state. . . ." The words "state aid" were not included until 1945, General Statutes (Sup. 1945) § 38h, when this sentence was modified to read, "Each such hospital receiving state aid shall be paid at the rate of four dollars per day." "An amendatory act is presumed not to change the existing law further than is expressly declared or necessarily implied." *State* v. *Fahy*, 149 Conn. 577, 582, 183 A.2d 256. Inclusion of the term "state aid" did not change the meaning of the appropriations provision—that hospitals receiving state appropriations could charge the state only the statutory amount for the care of state-supported patients—but merely brought the terminology into conformance with that already in use in the following four provisions imposing obligations upon state-aided hospitals. Additionally, at the time of this modification, § 4-106, the statute imposing an obligation to treat patients with venereal disease on those hospitals receiving state appropriations, was already in existence. General Statutes (Sup. 1935) § 43c. If the interrelated history of these hospital provisions is to be considered, particularly in light of their repetitive use of the term "state aid" as a reference for appropriations by the General Assembly, it can hardly now be determined that this term's usage in the record inspection provisions is to be accorded a far broader reach. We therefore con-

clude that the term "state aid" as it appears in General Statutes §§ 4-104 and 4-105 refers only to appropriations by the General Assembly.[8]

Our opinion in this case accords with an earlier opinion concerning the Institute of Living. In 1946, this court was confronted with the question of whether the Institute of Living was a tax-exempt institution. In the very year in which §§ 4-104 and 4-105 were enacted, the legislature altered the exemption statute to include "all property of, or held in trust for, any hospital society or sanatorium which is supported wholly or in part by state appropriations." 1927 Public Acts, c. 319 § 1 (14). The court concluded that while this was the sole exemption provision available to the Institute, it was not, in fact, available to it because the Institute had chosen not to procure appropriations. The court was less hesitant in reaching this conclusion because such "aid" was widely available. Noting the obligations imposed upon a "hospital receiving state aid," the court, citing the provisions reviewed above, continued: "It does not appear that the plaintiff has at any recent time sought state aid and been refused. If it is willing to assume the obligations incumbent upon a state-aid[ed] hospital . . . there is little reason to doubt that it could secure a state appropriation, with an incidental exemption from taxation." *Institute of Living* v. *Hartford,* 133 Conn. 258, 272, 50 A.2d 822. It was apparently clear then, as now, that it is the appropriations by the General Assembly which trigger the obligations imposed upon state-aided hospitals by §§ 4-101–4-107.

[8] A thorough reading of the appropriations statute, § 4-101, in both its present and prior forms, persuades us that the defendant, too, errs in its assertion that the term "state aid" within §§ 4-104 and 4-105 refers to appropriations for capital projects only.

The facts before this court also confirm the result we have reached. Included in the record are letters from the Institute to the welfare department, dated October, 1955, and December, 1957, indicating that "the Institute is unable to apply for a 'state aid' rate as it is precluded therefrom by statute because our hospital does not receive a grant from the General Assembly." It is clear that the welfare department was in agreement with this and the contract amount specified for reimbursement to the Institute for services rendered indigent patients was arrived at through negotiation. The facts further reveal that such reimbursements as the Institute received did not overall benefit the Institute, for as the stipulation itself reveals: "During fiscal 1974-1975 the Institute sustained a loss on welfare patients of approximately $61,000." The Institute declined to seek reimbursement pursuant to § 17-312, a course of conduct in accordance with its decision not to seek appropriations from the General Assembly.

Because the Institute chose not to reap the benefits of a state appropriation, it cannot now be called upon to accept the obligations imposed on those institutions which chose to accept such benefits. It is not for this court to impose obligations not intended by the legislature. That our analysis has led to the determination that the Institute does not receive "state aid" within the meaning of §§ 4-104 and 4-105 forecloses us from addressing those questions reserved which concern the nature of the duty imposed upon state-aided hospitals to allow discharged patients to obtain hospital records. We realize the importance of those issues. It is, however, for the legislature to delineate the nature and extent of the obligations it imposes.

To question two in the reservation we answer in the negative; the result we have reached with respect to this question makes it unnecessary to respond to those remaining questions reserved to this court.

No costs will be taxed in this court to either party.

In this opinion HOUSE, C. J., LONGO and SPEZIALE, Js., concurred.

BOGDANSKI, J. (dissenting). The sole issue in this case is the interpretation of a plainly worded statute:[1]   does that statute grant the plaintiff, a discharged patient of the defendant Institute of Living, access to her medical records.

Section 4-104 of the General Statutes provides that a private hospital receiving state aid shall, upon the demand of any discharged patient, permit such patient to examine his or her medical records. That the plaintiff, Jane Doe, is a former patient and that the defendant Institute of Living is a hospital which receives property tax exemptions cannot be disputed.   See *Institute of Living* v. *Hartford,* 133 Conn. 258, 272, 50 A.2d 822.

This court has repeatedly held that when the state grants exemptions to an institution from the payment of taxes, it gives aid to such institution

[1] "[General Statutes] Sec. 4-104.   INSPECTION AND SUBPOENA OF HOSPITAL RECORDS.   Each private hospital, public hospital society or corporation receiving state aid shall, upon the demand of any patient who has been treated in such hospital and after his discharge therefrom, permit such patient or his physician or authorized attorney to examine the hospital record, including the history, bedside notes, charts, pictures and plates kept in connection with the treatment of such patient, and permit copies of such history, bedside notes and charts to be made by such patient, his physician or authorized attorney. . . ."

"just as much and just as efficiently as it would by the appropriation of an amount equal to the taxes the corporation or institution would be required to pay were there no exemption. The result in either case, although accomplished by different means, is precisely the same." *Corbin* v. *Baldwin,* 92 Conn. 99, 105, 101 A. 834; *Snyder* v. *Newton,* 147 Conn. 374, 386, 161 A.2d 770, appeal dismissed, 365 U.S. 299, 81 S. Ct. 692, 5 L. Ed. 2d 688; *Legat* v. *Adorno,* 138 Conn. 134, 143, 83 A.2d 185; *Lyman* v. *Adorno,* 133 Conn. 511, 516, 52 A.2d 702; *Corbin* v. *American Industrial Bank & Trust Co.,* 95 Conn. 50, 52, 110 A. 459.

Indeed, to the recipient institution, an exemption from taxes is in many ways a more effective way of receiving state aid than a direct pecuniary appropriation. A direct appropriation depends each year upon the will of the legislature and the fullness of the state's coffers. The tax exemptions, on the other hand, are granted on a perpetual basis as long as the exempt institution abides by the provisions of § 12-81[2] of the General Statutes. The statutes exempt the institution not only from property taxes but from state sales taxes and state succession taxes as well.

In any event, the statute under consideration says nothing about direct appropriations: it speaks only of state aid. Because the Institute of Living

[2] General Statutes § 12-81 provides in pertinent part: "The following-described property shall be exempt from taxation: . . . (16) Hospitals and sanatoriums" provided that "quadrennially . . . a statement on forms prepared by the tax commissioner shall be filed by such hospital society, corporation or sanatorium on or before the last day required by law for the filing of assessment returns with the local board of assessors of any town, consolidated town and city or consolidated town and borough, in which any of its property claimed to be exempt is situated."

receives state aid through its tax exemptions it is subject to the provisions of § 4-104 of the General Statutes and must permit the plaintiff to examine her medical record. Her right to the record is unconditional. The language of the statute is clear and unambiguous and is not subject to modification by construction. *Colli* v. *Real Estate Commission,* 169 Conn. 445, 450, 364 A.2d 167; *Bahre* v. *Hogbloom,* 162 Conn. 549, 553, 295 A.2d 547. "We cannot 'search out some intent which we may believe the legislature actually had and give effect to it, . . . we are confined to the intention which is expressed in the words it has used.' *Connecticut Light & Power Co.* v. *Walsh,* 134 Conn. 295, 301, 57 A.2d 128." *Kulis* v. *Moll,* 172 Conn. 104, 110, 374 A.2d 133; *Madison Education Assn.* v. *Madison,* 174 Conn. 189, 192, 384 A.2d 361.

Whether a discharged mental patient should have unrestricted access to his or her medical record is a matter which must be addressed to the legislature and not to the court. "Legislation consists of formulating a rule for the future. A judgment [of the court] applies the law to past or present facts." *Eastern Oil Refining Co.* v. *Court of Burgesses,* 130 Conn. 606, 610, 36 A.2d 586; *Prentis* v. *Atlantic Coast Line Co.,* 211 U.S. 210, 29 S. Ct. 67, 53 L. Ed. 150. This court, therefore, cannot go any further than to apply the law to the statute as presently written.

Moreover, the effect of the majority opinion is to invite a challenge to the statute as discriminatory and violative of the equal protection clauses of the Connecticut and the federal constitutions on the ground that the state cannot grant rights to one class of persons and deny those same rights to

another class of persons similarly situated without a rational basis for the distinction. *Horton* v. *Meskill,* 172 Conn. 615, 640, 376 A.2d 359. A difference in status can provide a difference in treatment only if the classification bears a fair and substantial relation to the object of the legislation. *Royster Guano Co.* v. *Virginia,* 253 U.S. 412, 415, 40 S. Ct. 560, 64 L. Ed. 989. There can be no basis for such a classification here.

The questions reserved should be answered as follows: (1) Yes; (2) Yes; (3) Yes; (4) No.